UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

UNITED STATES OF AMERICA                                                    Plaintiff

v.                                                        Criminal Action No. 3:23-cr-142-RGJ

GREGORY KILGORE, III                                                         Defendant

\* \* \* \* \*

**MEMORANDUM OPINION AND ORDER**

Defendant Gregory Kilgore ("Kilgore") moves to suppress an incriminating statement given to law enforcement based on a violation of his Fifth Amendment *Miranda* rights, which the United States opposes. [DE 19; DE 20]. Both parties requested an evidentiary hearing, [DE 19 at 54; DE 20], which was held on April 10, 2024. [DE 21; DE 23 ("First Hearing Transcript")]. After the hearing, the United States and Kilgore both submitted post-hearing briefs, and the United States submitted a post-hearing reply brief. [DE 26; DE 29; DE 32]. After the hearing, Kilgore also moved to suppress "all evidence obtained" during Kilgore's "unlawful arrest." [DE 22]. The United States responded and requested a second hearing on this motion, which the Court granted. [DE 32; DE 33]. A second hearing was held on July 16, 2024. [DE 35; DE 36 ("Second Hearing Transcript")]. After the second hearing, the United States and Kilgore both submitted post-hearing supplements. [DE 42; DE 43]. These matters are now ripe. For the reasons below, the motion to suppress the incriminating statements [DE 19] is **GRANTED in part and DENIED in part** and the motion to suppress evidence obtained in violation of Fourth Amendment rights [DE 22] is **DENIED**.

## I. BACKGROUND

During the two evidentiary hearings, Kentucky State Police ("KSP") officers testified that the relevant facts of their investigation, as they pertain to Kilgore, occurred on two days. On November 6, 2023, law enforcement surveilled the parking lot outside Kilgore's apartment building and conducted a controlled purchase of narcotics involving a different individual targeted by the investigation (the "Target") and a confidential informant (the "Informant"). On November 20, 2023, law enforcement detained the Target during his appointment at Kentucky Probation and Parole, and subsequently arrested Kilgore at his apartment building. Below, the Court summarizes the testimony from both hearings.

<u>The Investigation</u>

Prior to Kilgore's arrest on November 20, 2023, KSP officers had been conducting a narcotics investigation involving an apartment building located at 642 South Second Street, Louisville, Kentucky, where Kilgore lived. [DE 19 at 52; DE 26 at 118]. On November 6, 2023, law enforcement visited the apartment complex while investigating the Target. [DE 36 at 155]. On that day, KSP Trooper Dillon Spencer ("Spencer") performed surveillance in the parking lot of the apartment complex. [*Id.*]. Spencer observed a "controlled purchase" between the Target and the Informant. [*Id.*]. While conducting the controlled purchase with the Target, the Informant told Spencer that the Target was waiting for another person he referred to as his "brother" to deliver controlled substances to him. [*Id.*].

During his surveillance, Spencer also witnessed Kilgore leave the apartment building carrying a bag and return carrying the same bag. [*Id.* at 156]. Spencer confirmed that Kilgore was not a part of the investigation until Spencer surveilled him on November 6, 2023, and law enforcement had no other contact with Kilgore until they arrested him on November 20, 2023. [*Id.*

at 180]. According to Spencer, the Target completed the purchase with the Informant within a matter of minutes of Kilgore returning to the apartment building. [*Id.* at 181]. Spencer neither witnessed Kilgore interact with the Target or the Informant, nor did he observe Kilgore handling money or narcotics. [*Id.* at 166]. Additionally, law enforcement obtained no video or photographs of Kilgore interacting with the Target or the Informant. [*Id.* at 183]. Spencer stated that he saw several other individuals enter and leave the garage door that Kilgore and the Target used on November 6, 2023, and it was common for apartment residents to use that door. [*Id.* at 185]. The Informant never mentioned Kilgore's name or Apartment 402, where Kilgore lived. [*Id.* at 171].

KSP Detective Anthony Hardin ("Hardin") also participated in the investigation. The morning of November 20, 2023, Hardin and another detective contacted the Target at the Kentucky Probation and Parole office, where the Target had an appointment. [DE 36 at 188]. After Hardin mirandized the Target, the Target said he wanted to cooperate, advised that there were narcotics in his apartment, and, as part of that conversation, advised Hardin that he got his narcotics from Kilgore in Unit 402. [*Id.* at 188].[1] The Target also showed law enforcement text messages with multiple individuals on his phone, but Hardin could not recall if Kilgore was one of them. [*Id.* at 212–13]. Also, as part of that interview, it was confirmed that nobody was in the Target's apartment for purposes of conducting a search. [*Id*. at 175].

Spencer talked to the apartment staff around 9:00 a.m. to execute the search warrant on the Target's apartment. [*Id*. at 160, 168, 188, 191]. The apartment staff made Spencer aware that the Target had a "brother" living in the apartment complex in Unit 402 and showed Spencer a photo of Kilgore. [*Id*. at 160–61, 168]. The Target was still at Kentucky Probation and Parole when the search of the Target's apartment took place and officers found a significant amount of narcotics—

---

[1] No video or audio recording of the interview with the Target at the Kentucky Probation and Parole office exists. [*Id.* at 194–95].

enough to be indicative of trafficking. [*Id.* at 173–74, 189]. Hardin acknowledged that the Target was facing a "substantial amount" of time in prison. [*Id.* at 196]. He also acknowledged that law enforcement did not have the Target call, meet, or message Kilgore to confirm the Target's allegation that Kilgore was his source of narcotics. [*Id.* at 198].

Kilgore's Arrest

The same day officers were executing the search warrant on the Target's apartment, November 20, 2023, officers stopped Kilgore coming off the elevator of the floor to his apartment and Kilgore was later arrested. Spencer explained that before approaching Kilgore, law enforcement became aware of Kilgore's "criminal history," which include violent felonies and indicated a previous instance of attempting to elude arrest. [*Id.* at 162]. Spencer also testified that it is common for drug traffickers to possess and carry firearms. [*Id.*].

KSP Troopers Ethan Whitlock ("Whitlock") and Spencer testified about their interactions with Kilgore inside his apartment complex. Whitlock and Spencer testified that they received information that Kilgore was potentially involved in drug trafficking, although neither identified that the source of this information was the Target at the first hearing.[2] [DE 23 at 66, 95]. As noted above, before approaching Kilgore, officers had spoken to apartment staff as part of executing the search warrant on the Target's apartment. The staff informed them that they believed the Target

---

[2] Whitlock acknowledged on cross-examination that the information came from someone arrested that day as part of a broader investigation. [DE 23 at 81]. At the second hearing, Spencer explained that this individual was the Target. [*See* DE 36]. At various points throughout the first hearing, the United States and Kilgore disagreed as to whether Kilgore's counsel should be able to question Whitlock and Spencer about the source who identified Kilgore as someone who may have narcotics located in his apartment. [*See*, *e.g.*, DE 23 at 82–83, 88–89, 101–05]. The Court explained that this information might be relevant to other issues surrounding the arrest that could be raised in separate motions—such as whether the search warrant to enter Kilgore's apartment was valid—but that this went beyond the purpose of the motion to suppress Kilgore's statement to law enforcement based on a violation of his Fifth Amendment rights under *Miranda*. [*Id.* at 103–04]. At the second hearing, Kilgore's counsel revealed that the United States had inadvertently disclosed the Target's identity to Kilgore, but both parties agreed that identifying the Target by name in the public record was unnecessary for the purpose of Kilgore's motions. [DE 36 at 168–69].

had a "brother" who lived in the building, showed the officers a photo of Kilgore, and told them that he lived in Unit 402. [DE 36 at 46, 160]. Spencer—who was located on the ground floor with one other officer—observed Kilgore entering the elevator at the ground floor of the building and notified four other officers who were waiting to intercept Kilgore on the fourth floor where his apartment was located. [DE 23 at 75, 98]. Kilgore was alone on the elevator on his way to the fourth floor. [*Id.* at 75]. Upon reaching the fourth floor, Kilgore was confronted by Whitlock and the other three officers already waiting outside the elevator door. [*Id.* at 77]. Spencer and the other officer on the ground floor reached the fourth floor "around a minute" later. [*Id.* at 98–99].

Officers confronted Kilgore before he got off the elevator on the fourth floor, pulling his arms behind his back and handcuffing him. [*Id.* at 69; Whitlock Body Camera ("Exh. 1") at 00:30-00:40]. Officer Spencer testified law enforcement approached Kilgore in the way they did, by handcuffing him and patting him down, based on Kilgore's violent criminal history and prior attempt to avoid apprehension. [DE 36 at 161–62]. All officers at the scene were armed, including one officer who stood outside of Kilgore's apartment door with a rifle drawn. [*Id.* at 78; Exh. 1 at 01:20–03:00]. Whitlock acknowledged that officers pointed a gun at Kilgore at some point at the beginning of the interaction, but it does not appear on Whitlock's body camera. [*Id.* at 79–80]. Although officers handcuffed him at the beginning of the interaction [Exh. 1 at 00:30–00:40], they later removed the handcuffs. [DE 23 at 79–80]. Kilgore either dropped or sat down some items he was carrying on the elevator, including his wallet and keys, which law enforcement retrieved. [*Id.*; Exh. 1 at 00:20–00:25]. Because there was no audio for the first thirty seconds of Whitlock's

5

body camera footage,[3] it was unclear whether officers instructed Kilgore to set these items down or if he put them down voluntarily. Whitlock testified that he could not recall whether officers asked Kilgore to do so. [*Id.* at 73]. Kilgore argues in his motion that officers tried the key in the lock of the apartment door prior to obtaining Kilgore's incriminating statement, but the video does not corroborate this allegation.

Kilgore made several statements to law enforcement throughout the interaction. Whitlock testified that, before Spencer read Kilgore his *Miranda* rights, he asked Kilgore as they walked down the hallway toward his apartment if (1) anyone else was inside the apartment and (2) if he minded if officers went inside. [*Id.* at 69]. His body camera shows that he stated, "this is the key that unlocks it" and posited to Kilgore, "and you're fine with us going in there man, with you?" [Exh. 1 at 00:30–00:40]. Kilgore did not grant permission to enter the apartment at that time, but asked "what's going on?" [*Id.*]. Before he exited the elevator, during the first thirty seconds of body camera footage with no sound, Whitlock claims that the following exchange occurred:

> When contact was made with Mr. Kilgore at the top of the elevator during the first 30 seconds of the body camera footage, as he was getting off the elevator, he's like "What's going on?" I don't know the exact words, but it was something along the lines of "We're doing a drug investigation and we think you have drugs in your apartment." The response was something about "Yeah, dude, do you want to go see them?" That's why we were walking down the hallway.

[*Id.*]. After walking Kilgore down to his apartment door, while Whitlock held the keys to Kilgore's apartment and another officer stood at his door with a rifle, Kilgore again asked what was going on. [Exh. 1 at 01:30–01:35]. Spencer provided Kilgore his *Miranda* warning and Kilgore acknowledged that he understood his rights. [*Id.* at 97; Exh. 1 at 01:40–02:15]. He was then

---

[3] Whitlock testified that it is normal for the body cameras to require thirty seconds to begin recording audio. [DE 23 at 67]. However, Whitlock also muted his body camera for three minutes and seventeen seconds at a later point in the recording in order to have a conversation with another officer on scene, Special Agent Borders. [DE 23 at 68]. Whitlock never testified as to what this conversation was about or why it was necessary to mute his body camera for its duration.

informed that officers were conducting a narcotics investigation and asked if he was willing to talk with officers. [Exh. 1 at 01:40–02:15]. Kilgore responded for the second time that he wanted to understand what was going on. [*Id.* at 02:15–02:17]. Whitlock and Spencer told Kilgore that they suspected drugs were inside his apartment. [*Id.* at 02:17–02:20]. Spencer replied that they were conducting an investigation but would "not go into detail," asking again if Kilgore had narcotics in his apartment. [*Id.* at 02:20–02:26]. At that point, Kilgore acknowledged that there were drugs inside. [*Id.* at 02:26–02:30; DE 29 at 129–30]. When asked about the quantity of drugs, Kilgore stated "you all can see." [*Id.* at 02:45–02:47]. Spencer notified Hardin of Kilgore's statement, and Hardin and the Target came to the apartment complex parking lot, where Hardin typed of the warrant to search Kilgore's apartment. [*Id*. at 190]. In Hardin's affidavit, Hardin stated that Kilgore was "associated" with the Target. [DE 36 at 207]. Hardin's affidavit did not state that law enforcement suspected Kilgore of possibly supplying the Target with narcotics on November 6, 2023. [*Id.* at 207]. As noted above, Spencer testified that apartment staff confirmed around 9:00 that morning that that they believe the Target had a "brother" who lived in the building. [*Id.* at 160]. Hardin's affidavit does not reference this information. [*Id.* at 219].

After making these statements, Kilgore was detained for several hours in the hallway while law enforcement waited for a search warrant to be obtained. [*Id*. at 80]. Later in the interaction, Kilgore asked if the officers had "a warrant" and stated that he believed he was going to jail. [Exh. 1 at 06:25–06:30]. The search warrant was executed that same day.

## II. FIFTH AMENDMENT CLAIM

"No person . . . shall be compelled in any criminal case to be a witness against himself[.]" U.S. Const. amend. V. To protect this right, the Supreme Court has determined that "[b]efore conducting a custodial interview, a law enforcement officer must warn the suspect of his rights

7

under the Fifth Amendment, including his right to remain silent in response to the officer's questions." *United States v. Slone*, No. CRIM. 12-5-ART-(4), 2013 WL 3799419, at *4 (E.D. Ky. July 19, 2013) (citing *Miranda v. Arizona*, 384 U.S. 436, 444 (1966)). A *Miranda* warning

> need not be formulaic. Indeed, there is no "talismanic incantation" officers must follow. Rather, what officers must do is warn a suspect in a manner that, to invoke a baseball analogy, "touches all of the bases" reasonably to convey to a suspect his rights under *Miranda*. Instead, our test is a practical one: Would a suspect hearing the warnings reasonably understand his options regarding interrogation?

*United States v. Clayton*, 937 F.3d 630, 638 (6th Cir. 2019) (internal citations omitted).

The safeguards "prescribed by *Miranda* are to ensure that the police do not coerce or trick captive suspects into confessing." *Berkemer v. McCarty*, 468 U.S. 420, 433 (1984). But a "defendant may waive effectuation of these rights, provided the waiver is made voluntarily, knowingly and intelligently." *Miranda*, 384 U.S. at 444. "Waiver is voluntary when 'it was the product of a free and deliberate choice rather than intimidation, coercion, or deception.'" *United States v. Ramamoorthy*, 949 F.3d 955, 964–65 (6th Cir. 2020) (quoting *Moran v. Burbine*, 475 U.S. 412, 421 (1986)); *see also United States v. Adams*, 583 F.3d 457, 467 (6th Cir. 2009) ("Only if the 'totality of the circumstances surrounding the investigation' reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived.") (citations omitted). The Sixth Circuit's test "for determining whether the police coerced the subject is as follows: '(i) the police activity was objectively coercive; (ii) the coercion in question was sufficient to overbear the defendant's will; and (iii) the alleged police misconduct was the crucial motivating factor in the defendant's decision to offer the statement.'" *United States v. Meredith-Hill*, No. 20-3083, 2021 WL 3079695, at *4 (6th Cir. July 21, 2021) (quoting *United States v. Mahan*, 190 F.3d 416, 422 (6th Cir. 1999)).

Generally, in a suppression hearing, the burden of proof rests with the party seeking to suppress the evidence. *United States v. Smith*, 783 F.2d 648, 650 (6th Cir. 1986). When a defendant seeks suppression of his statement based on *Miranda*, he must establish by a preponderance of the evidence that he was subjected to a custodial interrogation. *United States v. Lawrence*, 1989 WL 153161, at *5 (6th Cir. Dec. 18, 1989) (*per curiam*) (citing *Colorado v. Connelly*, 479 U.S. 157, 168–69 (1986) and *United States v. Charles*, 738 F.2d 686, 692 (5th Cir. 1984)). A suspect is in custody if, under the totality of the circumstances, a reasonable person would not feel free to end the interrogation by the police and leave. *See Yarborough v. Alvarado*, 541 U.S. 652, 663 (2004); *see also Mahan*, 190 F.3d at 421 (quoting *Berkemer*, 468 U.S. at 442) ("In determining whether a suspect is 'in custody' for purposes of applying the *Miranda* doctrine, 'the only relevant inquiry is how a reasonable man in the suspect's position would have understood his situation.'").

If the defendant proves that he faced a custodial interrogation, the United States then has the burden of proving, by a preponderance of the evidence, that (1) the defendant was provided the required *Miranda* warning, *Adams*, 583 F.3d at 467–68 (citing *United States v. Nichols*, 512 F.3d 789, 798 (6th Cir. 2008)), and (2) validly waived his *Miranda* rights. *Seymour v. Walker*, 224 F.3d 542, 554 (6th Cir. 2000). This inquiry is performed "primarily from the perspective of the police," *United States v. Al-Cholan*, 610 F.3d 945, 954 (6th Cir. 2010) (quoting *Garner v. Mitchell*, 557 F.3d 257, 263 (6th Cir. 2009) (en banc)), and factors to consider for voluntariness include "age, education, and intelligence of the defendant; whether the defendant has been informed of his *Miranda* rights; the length of the questioning; the repeated and prolonged nature of the questioning; and the use of physical punishment, such as deprivation of food or sleep." *United States v. Hill*, No. 3:09-CR-59, 2009 WL 5197867, at *2 (W.D. Ky. Dec. 23, 2009) (quoting

*McCalvin v. Yukins*, 444 F.3d 713, 719 (6th Cir. 2006)).  If a suspect is interrogated while in custody and he does not voluntarily, knowingly, and intelligently waive his *Miranda* rights, any statements he makes to the police must be suppressed.  *Id.* at 429; *see also United States v. Salvo*, 133 F.3d 943, 948 (6th Cir. 1998) (citing *Stansbury v. California*, 511 U.S. 318, 322 (1994)) ("[I]ncriminating statements elicited from suspects in custody cannot be admitted at trial unless the suspect was first advised of his or her *Miranda* rights.").

Neither party calls into question whether Kilgore was provided and understood his *Miranda* rights, therefore there is no challenge as to whether Kilgore waived his *Miranda* rights "knowingly" or "intelligently."  Spencer read Kilgore his rights at a time when he appeared calm and collected, and Kilgore stated clearly on Whitlock's body camera footage, "Yeah, I understand."  [Exh. 1 at 1:50–2:13].  Kilgore's motion primarily challenges whether Kilgore's waiver of *Miranda* rights was made "voluntarily," arguing that "coercive circumstances" created by officers pressured him to admit that narcotics were inside his apartment.  [DE 19 at 53; DE 29 at 128–29 ("[Kilgore] did not feel that he was free to not answer their questions, or, at the very least, he felt that it was pointless to refuse.")].

This argument raises multiple questions.  First, the Court must determine if and when Kilgore was detained and became subject to a custodial interrogation; second, whether the incriminating statements were made before or after Kilgore received his *Miranda* warning; and third, whether Kilgore waived his *Miranda* rights "voluntarily" or was intimidated or coerced by law enforcement to do so, given the totality of the circumstances.

First, Whitlock agreed that Kilgore was detained [DE 23 at 80] and the United States agrees in its brief that a custodial interrogation took place [DE 26 at 119], but *when* Kilgore was detained is significant.  The testimony at the hearing and Whitlock's body camera footage demonstrates by

10

a preponderance of the evidence that Kilgore was taken into custody the moment the elevator doors opened. From the first second of the encounter, officers took physical control of Kilgore, pulling his arms behind his back and handcuffing him. He was not even free to step off the elevator into the hallway of his own accord. As a result, no reasonable person would have felt free to leave under these circumstances, and any questions that officers asked Kilgore throughout the entirety of the interaction must be considered part of a custodial interrogation.

Kilgore allegedly gave two incriminating statements to officers: (1) when Whitlock claims that Kilgore responded "Yeah, dude, do you want to go see them?" after officers informed him that they suspected drugs were in his apartment and (2) when Kilgore acknowledged that officers would find drugs in his apartment and said he believed he would go to jail. The first statement was given before he received any *Miranda* warning but after he was in custody because Kilgore was detained from the moment he was intercepted by law enforcement. The second statement was given after Kilgore received his *Miranda* warning and affirmed that he understood his rights.

As to the first statement, it is not clear that Kilgore even provided an incriminating statement at that time. There is no audio recorded from any of the officers on scene when Kilgore arrives on the fourth floor, therefore Whitlock's testimony is the only evidence of such a statement in the record. Whitlock struggled to recall exactly what he said to Kilgore on the elevator, testifying that he was unsure of the "exact words" but that it was "something along the lines of 'We're doing a drug investigation and we think you have drugs in your apartment.'" [DE 23 at 69]. Even though this was not phrased in the form of a question, the Court still considers it part of a custodial interrogation. *See United States v. Pacheco-Lopez*, 531 F.3d 420, 423 (6th Cir. 2008) (quoting *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980)) ("An 'interrogation' comprises . . . 'any words or actions on the part of the police that the police know are reasonably likely to elicit

11

an incriminating response from the suspect."). And Whitlock said the response was "something about" Kilgore replying, "do you want to go see them?" [DE 23 at 69]. Kilgore argues that this alleged statement was not included in the search warrant affidavit, but that document is both not in the record and outside the scope of Kilgore's motion to suppress as to Miranda. [DE 29 at 129]. Regardless of what was actually said in the elevator, to the extent that Kilgore did make an incriminating statement to Whitlock, that statement must be suppressed because it was obtained after Kilgore was detained and before a *Miranda* warning was given. *See Salvo*, 133 F.3d at 948 (citing *Stansbury*, 511 U.S. at 322).

Whether the second statement must be suppressed turns on whether Kilgore voluntarily waived his *Miranda* rights. Officers approached Kilgore at the elevator in plain clothes and immediately detained him. They pulled his arms behind his back and handcuffed him, picked up the keys to his apartment, and posted an officer with a rifle in front of his front door during questioning. When first asked whether he consented to officers entering his apartment, he did not grant permission and asked what was going on. But the officers were careful to *Mirandize* Kilgore quickly into the interaction, less than two minutes after it began, before asking him any questions about narcotics. Kilgore said he understood in response to being read his *Miranda* rights. The officers did not say that Kilgore was under arrest or that they had a search warrant. The officers' demeanor and Kilgore's demeanor was calm throughout the interaction. Kilgore gave the second incriminating statement after receiving his *Miranda* warning and stating that he understood it. The United States has met its burden of demonstrating by a preponderance of the evidence that, under the totality of the circumstances, Kilgore's second incriminating statement was the "product of a free and deliberate choice rather than intimidation, coercion, or deception." *Ramamoorthy*, 949

F.3d at 964–65 (quoting *Moran*, 475 U.S. at 42). As a result, the statement will not be suppressed. *Seymour*, 224 F.3d at 554.

### III. FOURTH AMENDMENT CLAIM

"It is well settled that in seeking suppression of evidence the burden of proof is upon the defendant to display a violation of some constitutional or statutory right justifying suppression." *United States v. Rodriguez-Suazo*, 346 F.3d 637, 643 (6th Cir. 2003) (quoting *United States v. Feldman*, 606 F.2d 673, 679 n.11 (6th Cir. 1979)).

"[T]he Constitution forbids . . . not all searches and seizures, but unreasonable searches and seizures." *United States v. Campbell*, 486 F.3d 949, 953 (6th Cir. 2007) quoting *Terry v. Ohio,* 392 U.S. 1, 9 (1968). "Encounters between police officers and citizens can be grouped into three categories: 'consensual encounters in which contact is initiated by a police officer without any articulable reason whatsoever and the citizen is briefly asked some questions; a temporary involuntary detention or *Terry* stop which must be predicated upon reasonable suspicion; and arrests which must be based on probable cause.'" *Id*. citing *United States v. Bueno*, 21 F.3d 120, 123 (6th Cir.1994).

"A seizure of an individual . . . occurs when 'under the totality of the circumstances, a reasonable person would have believed that he or she was not free to walk away.'" *Campbell*, 486 F.3d at 954 citing *United States v. Alston*, 375 F.3d 408, 411 (6th Cir.2004). Once an "individual is 'seized,' the police officer must have a reasonable suspicion of criminal activity to justify a *Terry* stop, or probable cause to justify an arrest, in order for the seizure to comply with the Fourth Amendment." *Id*.

An investigative stop or *Terry* stop must be supported only by reasonable suspicion. *Terry,* 392 U.S. at 30. Reasonable suspicion requires more than a "hunch," but less than probable cause.

*United States v. Sokolow*, 490 U.S. 1, 7 (1989); *see also United States v. Belakhdhar*, 924 F.3d 925, 928 (6th Cir. 2019) (Reasonable suspicion "does not present a particularly high bar."). To have reasonable suspicion, an officer "must be able to point to specific and articulable facts, which taken together with rational inferences from those facts, reasonably warrant the intrusion." *Terry*, 392 U.S. at 21–22. "An investigative stop must be justified by some objective manifestation that the person stopped is, or is about to be, engaged in criminal activity." *United States v. Cortez*, 449 U.S. 411, 417 (1981); *see also United States v. Marxen*, 410 F.3d 326, 329 (6th Cir. 2005) (citing *United States v. Hensley*, 469 U.S. 221, 227 (1985)) ("[T]he [Supreme] Court has clarified that a *Terry* stop is also permissible where the stop relates to a crime already completed and where the information supplying the reasonable suspicion comes from another person rather than the officer's personal observations."). When determining whether reasonable suspicion exists, the Court must look at the totality of the circumstances. *United States v. Arvizu*, 534 U.S. 266, 273 (2002); *United States v. Younger*, 707 F.3d 598, 603 (6th Cir. 2012).

"Probable cause is not a high bar." *United States v. Helton*, 35 F.4th 511, 517 (6th Cir. 2022) (quoting *District of Columbia v. Wesby*, 583 U.S. 48, 57 (2018)) (internal quotations and citation omitted). It "requires only a probability or substantial chance of criminal activity, not an actual showing of such activity." *Id*. (quoting *Illinois v. Gates*, 462 U.S. 213, 243–44, n. 13 (1983)). "[A] warrantless arrest by a law officer is reasonable under the Fourth Amendment where the arrest is in public and there is probable cause to believe that a criminal offense has been or is being committed." *United States v. Abdi*, 463 F.3d 547 (6th Cir. 2006) (citation omitted). "To determine whether an officer had probable cause to arrest an individual, we examine the events leading up to the arrest, and then decide 'whether these historical facts, viewed from the standpoint of an objectively reasonable . . . officer, amount to' probable cause." *Maryland v. Pringle*, 540

U.S. 366, 371 (2003) (quoting *Ornelas v. United States*, 517 U.S. 690, 696 (1996)). "An arresting officer's state of mind, except for the facts that he knows, is irrelevant to the existence of probable cause." *Devenpeck v. Alford*, 543 U.S. 146, 153 (2004).

First the Court determines whether the initial stop of Kilgore getting off the elevator was supported by reasonable suspicion to be permissible *Terry* stop. On November 6th, officers had conducted a controlled buy from the Target at the apartment building. During the controlled buy, the Target said he needed to wait on his "brother" to obtain the narcotics and complete the transaction. Surveillance revealed that shortly after Kilgore returned to the apartment building, the Target came back out of the apartment building and completed the transaction with the Informant. Later, on November 20th, officers mirandized and interviewed the Target, who identified Kilgore as his source of narcotics. When officers went to execute a search of the Target's apartment shortly after or simultaneous with this interview, staff of the apartment building represented that the Target had a "brother" living in the apartment building and identified him by photo as Kilgore. Before approaching Kilgore, the officers had several pieces of information about Kilgore: (1) they observed him enter his apartment building shortly before the Target completed the controlled purchase on November 6, 2023; (2) had information from the Target from the controlled buy on Nov. 6, 2023 that the Target needed his "brother" to complete the transaction, and information from the apartment staff on November 20, 2023 that the Target had a "brother" living at the apartment complex identified by photograph as Kilgore, and (3) the Target identified Kilgore as his source of narcotics on November 20, 2023. These are specific and articulable facts, which taken together with rational inferences from those facts, supported reasonable suspicion to make a *Terry* stop of Kilgore when he got off the elevator, while officers were also present at the

apartment complex effectuating the search warrant on the Target's apartment. Together, they comprise more than just a hunch.

It was also reasonable for the officers to carry out the stop by placing Kilgore in handcuffs given the officers' awareness of his criminal history, which included a crime of violence (robbery) and an attempt to elude arrest, and Spencer's testimony that it is common for drug traffickers to carry firearms. *United States v. Walker*, 51 F.3d 274 (6th Cir. 1995) ("Case law permits use of force, such as handcuffs and guns, to effect a stop when such a show of force is reasonable under the circumstances of the stop."); *United States v. Hargis*, No. 5:21-CR-75-DCR-MAS, 2021 WL 5991830, at *4 (E.D. Ky. Oct. 22, 2021), report and recommendation adopted, No. CR 5:21-075-DCR, 2021 WL 5237966 (E.D. Ky. Nov. 8, 2021) ("The fact that multiple officers approached Hargis's Denali with their weapons drawn, ordered Hargis out of the vehicle and onto the ground, and immediately handcuffed him, did not convert the Terry stop into an unlawful detention or arrest.").

Next, the Court determines whether there was probable cause to arrest Kilgore and search his apartment. After being *Mirandized*, Kilgore acknowledged to the officers that there were drugs inside his apartment. When asked about the quantity of drugs, Kilgore stated "you all can see." [DE 23, Exh. 1 at 02:45–02:47]. This statement, coupled with the previous information detailed above that was known to the officers, demonstrated probable cause to suspect a crime had been committed, or was about to be committed. After Kilgore admitted having drugs in his apartment, officers secured a search warrant for Kilgore's apartment.

Kilgore cites *Wong Sun v. United States*, 371 U.S. 471 (1963) in support of his argument that the officers lacked probable cause. [DE 29 at 130]. Kilgore argues with this case that officers should have sought an arrest warrant because they did not have enough information to act on their

16

own and lawfully arrest Kilgore. [*Id*.] But in *Wong*, the Court found that information from an inexperienced informant was not enough for probable cause to arrest defendant. *Wong* is distinguishable because Kilgore was not under arrest until *after* he made incriminating statements. He was merely detained upon reasonable suspicion during a *Terry* stop. Further, in *Wong*, incriminating statements were made by the defendant inside his home after officers had already broken in. 371 U.S. at 486. Kilgore also cites *United States v. Pacheco-Alvarez*, 227 F. Supp. 3d 863, 869 (S.D. Ohio 2016). [DE 29 at 130]. In that case, an officer drove the defendant to his house after a traffic stop to obtain "consent" to search his home. *Pacheco-Alvarez*, 227 F. Supp. 3d at 874. In *Pachecho-Alvarez*, the Court held that the officer did not have justification to continue to detain the defendant after a traffic stop, even though the initial detainment was lawful. *Id*. Kilgore's circumstances are different, as his continued detention happened after Kilgore admitted he had drugs in his apartment.

### IV.    CONCLUSION

For the reasons explained, and the Court being otherwise sufficiently advised, Kilgore's motion to suppress the incriminating statement given in violation of his Fifth Amendment rights [DE 19] is **GRANTED in part and DENIED in part as set forth above** and Kilgore's motion to suppress evidence obtained in violation of his Fourth Amendment rights [DE 22] is **DENIED**.

November 12, 2024

Rebecca Grady Jennings, District Judge
United States District Court

cc: counsel of record